422 A.2d 973 (1980)
Ronald S. BOWYER, Appellant,
v.
UNITED STATES, Appellee.
No. 79-99.
District of Columbia Court of Appeals.
Argued April 9, 1980.
Decided October 6, 1980.
*974 Marshall H. Fishman (LS # 2411), law student counsel, with whom Michael E. Geltner, Washington, D. C., Supervising Atty., was on brief, for appellant.
Christopher A. Myers, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, and Peter E. George, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee. Paul L. Knight, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellee.
Before KELLY, NEBEKER and PRYOR, Associate Judges.
PRYOR, Associate Judge:
In April 1978, a grand jury returned a nine count indictment charging appellant with rape while armed of Melody Williamson in November 1975; armed robbery of Barbara Clark, May 19, 1977; first-degree murder while armed of Gwendolyn Baker, May 30, 1977; rape while armed and armed robbery of Linda Johnson, May 31, 1977; rape while armed of Karen Jones, June 5, 1977; sodomy, rape while armed and assault with intent to commit robbery while armed of Linda Jackson between June 11 and July 4, 1977.[1]
Following a jury trial, appellant was found guilty of rape while armed of Melody Williamson, armed robbery of Barbara Clark; and rape while armed and armed robbery of Linda Johnson. Appellant was found not guilty of first-degree murder while armed of Gwendolyn Baker. The jury was unable to reach a verdict as to the remaining counts. At the motion of appellant, a mistrial was declared as to the remaining offenses, and subsequently, upon motion of the government, those counts were dismissed. The court imposed consecutive sentences of seven to twenty-one years for each conviction of rape while armed and three to ten years for each armed robbery conviction. This appeal followed.
Appellant urges reversal of the convictions on the grounds that (1) the trial court abused its discretion in denying appellant's motion for severance; (2) the retention of alternate jurors after the jury retired to deliberate constituted reversible error; (3) *975 appellant was entitled to a pre-Arnold[2] corroboration instruction concerning the Williamson rape; (4) it was error for the trial court to fail to impose sanctions pursuant to the Jencks Act (18 U.S.C. § 3500 (1970)) with regard to the government's nonproduction of notes taken by a detective who appeared at trial as a witness for the government; and (5) the government failed to establish sufficiently the chain of custody with respect to the bullet alleged to have caused the death of one of the victims.[3] We affirm in part and reverse in part.

I
The evidence presented by the government consisted primarily of the testimony of five complaining witnesses, all of whom were admitted prostitutes. Each was the victim of a sexual assault under circumstances similar in nature. All of the crimes occurred in the early hours of the morning in secluded areas of the 14th Street corridor of the city. In each instance, the victim was lured or abducted into an automobile which was dark blue in color. In each case, the assailant was described as having a pockmarked face and armed with a gun. On each occasion, the assailant created fear in the mind of the victim by feigning despair and/or referring to his criminal background and past acts of violence. Lastly, in each instance care was taken to avoid identification after release of the complainant.
The trial testimony of the witnesses, including identification of appellant, was supplemented by the work of police investigators. It was shown, among other things, that appellant and his wife owned a blue Thunderbird automobile matching the description given by the complainants. The license plate was the same as that reported by one of the victims. Additionally, there was testimony that appellant owned and carried a gun similar to the one described by the government witnesses.

II

SEVERANCE
Appellant places considerable reliance upon his assertion that the court erred in failing to grant his motion for severance. In this regard, it is necessary to recount to some degree the nature of the evidence presented.
Melody Williamson testified that early in the morning on November 4, 1975, as she walked down Eighth Street, N.W., between L and M Streets, she was approached by appellant with whom she had previously engaged in sexual acts for money. She got into the car appellant was driving and was driven by him to a parking lot. Once there, appellant informed Williamson that he had no money. He nonetheless demanded that she have sexual relations with him. Williamson declined. Appellant then pointed a gun at Williamson and indicated his willingness to use it. Appellant told Williamson that he had been in jail, that his woman friend had deserted him, and that he had nothing to live for. He then ordered Williamson to take one leg out of her pants and underwear. At gunpoint, she complied. Appellant placed a gun against her vagina and threatened to "blow it out." He raped her and then drove to an alley near Seventh and M Streets and let her out.
Williamson noted the license number on the car appellant was driving. A WALES check by the police traced the car to appellant. Her description to the police of her assailant was that he was five feet nine inches to six feet tall, light skinned, with black marks on his face.
Barbara Clark testified that on May 19, 1977, while plying her trade on 14th and N Streets, N.W., at approximately 4:00 a. m., she was approached by a person she identified as appellant, driving a fairly new blue Thunderbird. After agreeing on a price of *976 $20.00, Clark got into the car appellant was driving and was taken by him to the parking lot. Once there, appellant pulled a gun on Clark but gave her $50.00. At that moment, appellant saw a security guard and drove on. At Ninth and Berry Streets he had relations with Clark, then demanded return of the $50.00. He then told Clark that he had just been released from jail. Appellant demanded and received all of Clark's money. Clark was then driven by appellant to an alley near 12th and S Streets where appellant placed a napkin over his front license plate, then released Clark after ordering her to run because he wanted "to kill somebody."
Clark described her assailant to the police as having pockmarks on his face and not a "real dark" complexion.
Shirley Coleman testified that on the evening of May 30, 1977, while sitting in a car on the corner of 14th and N Streets, N.W., she observed Gwendolyn Baker on the corner of the same street, talking with a black male, approximately 30 years old, with pockmarks on his face. Ms. Baker and the man conversed for approximately 10 minutes, then the man walked away. Shortly thereafter, the man returned in a dark car.[4] Ms. Baker entered the car after conversing with the man momentarily. They then drove up 14th Street to Vermont Avenue, where the car turned.
Coleman waited for Baker for a while. When she didn't return, Coleman left. Approximately 20 to 30 minutes later, Coleman returned and saw a woman, later identified as Baker, lying in the street.
Linda Johnson's testimony was that at approximately 4:00 a. m. on May 31, 1977, she was walking near Logan Circle when appellant drove up in a blue Thunderbird and approached her. A price of $20.00 was agreed upon for fellatio. She got into the car and appellant gave her $20.00. While the sexual act was being performed, appellant produced a gun. At a later point, appellant had intercourse with Johnson. When appellant concluded, he then demanded all of her money, but returned $30.00. He told Johnson that he shot a woman a week before who had gotten "cute and smart." He also told her that he had been released from jail two months earlier. Appellant expressed fear in allowing Johnson to leave the car because she might see his license plates. At her suggestion, he backed into an alley and allowed the complainant to leave the car in that manner. Nonetheless, she noted the first two letters of his license plate and later reported it to the police.
Karen Jones testified that early in the morning on June 5, 1977, while waiting for her husband on the corner of Ninth and M Streets, N.W., appellant drove up in a blue Thunderbird and asked for directions. When Jones bent down to give the directions, appellant pulled a gun on her and ordered her to get into the car. Appellant drove to a parking lot on Ninth Street between M and N Streets, N.W., where he ordered Jones to remove one leg from her shorts and underpants. Appellant then got on top of Jones in the front seat of the car and forcibly had intercourse with her. Later appellant drove Jones to Sixth and O Streets and told her to get out of the car and ordered her not to look back at the car or he would kill her.
Karen Jones' husband testified that he observed his wife get into a blue Cougar or Thunderbird and noted the tag number.
Linda Jackson testified that at about 4:00 a. m. in July 1977, while at the corner of 13th and N Streets, N.W., a man driving a dark blue Thunderbird approached her and requested a date. A price of $30.00 having been agreed upon, Jackson got into the car. Once inside the car, appellant locked the car doors, pulled a gun from his side, put it under her dress and threatened to harm her if she didn't cooperate. He informed her that he had killed before and was not hesitant about doing it again. He then ordered Jackson to perform certain sexual acts. Afterwards, appellant ordered Jackson to *977 get out of the car and threatened to shoot her if she looked back to get his license plate number.
In general, an accused may seek relief from a joinder of charges of similar character if it is likely that the jury could become confused or prejudiced to the detriment of the defendant. Thus, the prosecution cannot, merely by introducing evidence of other crimes, attempt to show the defendant's bad character or a tendency to commit crimes. Tinsley v. United States, D.C.App., 368 A.2d 531 (1976). However, in Bridges v. United States, D.C.App., 381 A.2d 1073, 1074 (1977), we approved joinder where "(1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others." It is well settled in this jurisdiction that "[e]vidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial." Drew v. United States, 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964) (footnote omitted).
In this instance, it seems clear that the allegations against appellant were, though similar in nature, separate and distinct. There was little likelihood of the charges being confused or treated as one event.
More importantly, at the trial of any one of the charges, evidence of other crimes would be admissible to show a common scheme or plan, or the identity of the assailant, for the method of perpetrating each crime shows a reasonable probability that the same person committed each. The victims were prostitutes working in the 14th Street corridor. Each was either abducted or induced into getting into appellant's car in the very early hours of the morning. Each victim described the car, in varying degrees of particularity consistent with appellant's, as a dark blue 1970 Thunderbird. Once each victim was in the car, she was driven to a parking lot or secluded area where she was either sexually assaulted, robbed, or both at gunpoint. The assailant in each case was described as having a poor complexion (pockmarks or acne). Each of the victims was forced at gunpoint to follow commands. The commands varied, but in two cases the victims were ordered to take one leg out of their pants and underwear and then were sexually assaulted. Appellant told stories to at least two victims of having recently been released from jail, deserted by his woman friend, and left with nothing to live for. Finally, the timing of the occurrences is significant, for with one exception, the incidents all took place within four to six weeks of each other.
The effect of the above "signatures" is to show, at a minimum, "that there is a reasonable probability that the same person committed" each crime. Id. at 16, 331 F.2d at 90.
We are satisfied from our review of the record, that the joinder of the counts against the appellant did not work undue prejudice. See Hackney v. United States, D.C.App., 389 A.2d 1336, 1344 (1978). It is evident from the verdict that the jurors did not cumulate evidence of separate crimes into a single "inculpatory mass" or improperly infer guilt of one crime because it found appellant guilty of another. See Bridges v. United States, supra at 1075. See also Arnold v. United States, D.C.App., 358 A.2d 335, 338 (1976) (en banc); Coleman v. United States, D.C.App., 298 A.2d 40 (1972). Rather, the jury was able to separate the evidence as to each offense and return selective verdicts on different counts.

III

RETENTION OF ALTERNATE JURORS
Appellant cites as error the fact that the alternate jurors were retained after the jury retired to deliberate. Super.Ct.Cr.R. *978 24(c) governs. It requires that "[a]n alternate juror who does not replace a regular juror shall be discharged at the time the jury retires to consider its verdict." Although this jurisdiction has not had occasion to interpret this section of Rule 24(c), a number of jurisdictions have interpreted Fed.R.Crim.P. 24(c), which is substantially the same. The courts have taken one of two positions with respect to the failure of a trial court to follow the command of Fed.R.Crim.P. 24(c). Where alternate jurors have joined the deliberations, courts have concluded that this constituted reversible error. United States v. Chatman, 584 F.2d 1358, 1361 (4th Cir. 1978) relying on United States v. Virginia Erection Corp., 335 F.2d 868, 872-73 (4th Cir. 1964); United States v. Beasley, 464 F.2d 468 (10th Cir. 1972). Other courts have concluded that while the failure of the trial court to discharge the alternate jurors at the time the jury retires is error, it is not, by itself, reversible error. There must be some showing of prejudice before appellant is entitled to a new trial. United States v. Allison, 481 F.2d 468, 472 (5th Cir. 1973); United States v. Nash, 414 F.2d 234, 236 (2d Cir. 1969), cert. denied, 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242 (1969); United States v. Hayutin, 398 F.2d 944, 950 (2d Cir. 1968), cert. denied, 393 U.S. 961, 89 S.Ct. 400, 21 L.Ed.2d 374 (1968). We find the cases cited by appellant which have adopted a per se rule to be inapposite because in each of those cases an alternate juror retired to the jury room with the jurors while they deliberated. Such was not the case here.
In the instant case, when the first twelve members of the jury retired to deliberate, alternates did not retire with them. The court instructed three alternates to wait in the courtroom and instructed them thusly:
Now, during the luncheon should the jury not come back before lunch, you will join the jury for lunch, but you will not discuss the case and they will not be discussing the case. Do not discuss the case with them but just wait. You may now retire and read the papers and do anything you want to do, but just wait back in the witness room, please.
The record is barren of any showing of prejudicial contact or communication between the regular and alternate jurors. The alternate jurors did not enter into the jury room during deliberation. While the jurors all went to lunch together, they were instructed not to talk with one another, and there is no suggestion that they did. Absent a showing that there was indeed communication among the jurors despite the court's instruction, we must heed "[t]he `rule'-indeed, the premise upon which the system of jury trials function . . . that juries can be trusted to follow the trial court's instructions." Parker v. Randolph, 442 U.S. 62, 75 n.7, 99 S.Ct. 2132, 2140 n.7, 60 L.Ed.2d 713 (1979).
While the trial judge did not comply with the letter of Super.Ct.Cr.R. 24(c), it is clear that no prejudice resulted therefrom. However, we caution trial judges to scrupulously comply with Rule 24(c) to avoid even the mere appearance of impropriety.

IV

CORROBORATION INSTRUCTIONS
Appellant next contends that the trial court erred in failing to instruct the jury that in order to find him guilty of the Williamson rape, corroboration of the complaining witness' testimony was required. This is so, appellant urges, because the Williamson rape occurred in 1975, prior to this court's 1976 en banc decision in United States v. Arnold, supra, which did away with the theretofore existing corroboration requirement. Appellant asserts that the failure of the court to give the corroboration instruction had the effect of imposing an ex post facto rule, as it changed the proof necessary for a rape conviction to require less testimony than the law required at the time of the commission of the offense. A historical analysis of the law of ex post facto illustrates the correctness of appellant's contention.
Ex post facto laws have been defined essentially the same through the years, with *979 some minor variations. In Calder v. Bull, 3 U.S. 386, 3 Dall. 386, 1 L.Ed. 648 (1798), the Court found that a resolution of the Connecticut legislature setting aside a probate decree, and granting a new hearing, where such could previously not be had, was not an ex post facto law, prohibited by the United States Constitution, because the resolution did not relate to a criminal matter. Ex post facto laws, said the Court, "are restricted to crimes, pains, and penalties." Id. The Court articulated the law of ex post facto as such:
An ex post facto law, within the meaning of the U.S. Constitution, is one which makes an action done before the passing of the law which was innocent when done, criminal; or makes a crime greater than it was before committed; or inflicts a greater punishment than the law annexed to the crime when committed, or alters the legal rules of evidence, and receives less, or different testimony, than the law required at the commission of the offense, in order to convict the offender. [Id. at 390.]
As is evidenced from the above quote, the Court early recognized that certain procedural changes could fall within the prohibition of the ex post facto clause. Kring v. Missouri, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1882), also illustrates this point.
In Kring, the Supreme Court invalidated a provision of the Missouri Constitution which allowed a defendant convicted and sentenced for murder in the second degree, to be tried for first-degree murder, where charged, when at the time the crime was committed for which petitioner was indicted, judgment and sentencing for second-degree murder amounted to an acquittal of the first-degree charge.
Finding that the new provision of the Constitution took away what was a good defense to the charge of murder in the first degree, at the time the crime was committed, the Court held that the law was ex post facto and, therefore, inoperative. In reaching this conclusion, the Court stated:
We are of the opinion that any law passed after the commission of an offense which . . . [i]n relation to that offense, or its consequences, alters the situation of a party to his disadvantage, . . . is an ex post facto law, and . . . [n]o one can be criminally punished in this country, except according to a law prescribed for his government by the sovereign authority before the imputed offense was committed, and which existed as a law at the time. [Id. at 226, 2 S.Ct. at 447.]
Two years later, in Hopt v. People of Utah, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), the Supreme Court upheld an Act passed subsequent to the date of a homicide for which appellant had been indicted, but prior to his trial for that offense, which repealed a portion of a Utah statute making convicted felons ineligible to be witnesses. In so doing, the Court distinguished the Utah law from laws similar to the one in Kring, supra:
Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not ex post facto . . . they do not . . . alter the degree, or lessen the amount or measure of proof which was made necessary to conviction when the crime was committed. [Id. at 589, 4 S.Ct. at 210 (emphasis supplied).]
Thus, the Court affirmed its earlier holding that procedural charges which lessen the quantity or degree of proof necessary to establish guilt may be obnoxious to the ex post facto clause. But, said the Court, where the new law "only remove[s] existing restrictions upon the competency of certain classes of persons as witnesses, . . . [this relates] to modes of procedure only, in which no one can be said to have a vested right. . . ." Id. at 590, 4 S.Ct. at 210.
In Thompson v. Missouri, 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898), the Supreme Court upheld a statute which made admissible previously inadmissible writing exemplars of the accused for the purpose of comparing them with certain incriminating writings. Finding that the statute was not ex post facto, the Court noted that the statute did not require "less proof in amount or degree" than was required at the *980 time of the commission of the offense charged. "Nor did it give the prosecution any right that was denied to the accused; for . . . it gave to each side the right to have disputed writings compared with writings proved to the satisfaction of the judge to be genuine." Id. at 387-88, 18 S.Ct. at 924-925. Thus, the Court distinguished laws which merely change evidentiary rules from those which change necessary proof, intimating that the latter would be ex post facto laws, while merely changing the method of proving an existing fact would not be.
From Calder, Kring, Hopt, and Thompson, a clear rule has emerged: Where a procedural change is made to an existing law which will adversely affect an accused by abrogating or impairing a defense which was available to the accused at the time of the offense; or by lessening or otherwise altering the quantity or degree of proof necessary to convict, the law comes within the prohibition of the ex post facto clause. However, where the legislative change "operate[s] only in a limited and unsubstantial manner to . . ." the disadvantage of a defendant, and solely changes the manner in which the trial is conducted, it is not prohibited. Beazell v. Ohio, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925).
This jurisdiction adopted the rule which emerged from the above cited cases in Frisby v. United States, 38 App.D.C. 22 (1912). The court held that a statute which enabled the pleadings of a criminal defendant in another judicial proceeding to be used as evidence against him in a subsequent proceeding when the same were previously inadmissible, was ex post facto. The court distinguished the facts in that case from those in Hopt, supra, and Thompson, supra:
[T]his is not an instance of merely increasing the number of witnesses to prove the same case that formerly existed. . . or of changing the method of proving an existing fact. . . . In . . . those cases the evidence made competent by statutes enacted after the commission of the crime. . . was of so little consequence as proof, that former convictions had been secured. . . without the evidence legislated into existence being used. . . . [Frisby v. United States, supra at 29.]
In Frisby, the changed statue would render admissible a forged instrument which would be prima facie proof of the offense charged, forgery. According to the court, such an enactment would clearly change the defendant's situation to his disadvantage and, therefore, was violative of the ex post facto clause. Id. at 29.
In Dixon v. United States, D.C.App., 287 A.2d 89, 97 (1972), this court found that where introduction of the accused's prior conviction for the purpose of impeachment was prohibited by statute at the time of the offense for which he was indicted, but made permissible by an amendment prior to his trial, the introduction into evidence of the prior conviction did not violate the ex post facto clause. The court noted, however, that the change in that case was merely in the mode of trial. The court recognized that a change which deprived the accused of any defense, modified the element of proof, or denied him of any substantial immunity which he previously had, would be an ex post facto law. Id. at 97. Compare United States v. Henson, 159 U.S.App.D.C. 32, 486 F.2d 1292 (1973) (en banc), where the District of Columbia Circuit Court found the same amendment to the District of Columbia impeachment statute to violate the ex post facto clause if applied retroactively.[5]
In the instant case, we have not a legislative enactment, but rather a judicial opinion which appellant asserts changed the necessary proof for a rape conviction, requiring less testimony than the law required at the time of the commission of the offense. If applied retroactively to change the quantum or kind of proof necessary to show guilt, judicial decisions are, like legislative enactments, ex post facto. Bouie v. *981 City of Columbia, 378 U.S. 347, 353, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964). Thus, the critical question before this court is: Was the effect of depriving appellant of a pre-Arnold corroboration instruction to change the quantity or degree of proof necessary to establish guilt of rape. If the answer to this query is affirmative, the afore-cited cases mandate that we reverse the conviction with respect to the Williamson rape.
In 1975, the year in which appellant was found to have committed the Williamson rape, an accused could not be convicted of rape without some evidence, direct or circumstantial, which corroborated the victim's testimony. Arnold, supra at 340. The trial court was required to instruct the jury to that effect, or in the absence of corroborating proof, grant a motion to acquit. United States v. Bryant, 137 U.S.App.D.C. 124, 128, 420 F.2d 1327, 1331 (1969). The Arnold decision held in part that in the future, no corroboration instruction need be required or given in the trial of rape cases in order to withstand a motion for judgment of acquittal.
Corroboration, obviously not an element of the crime of rape, but rather, independent proof necessary to convict an accused of rape, was abolished as a requirement by the Arnold decision. The decision altered the legal rules of evidence to require less testimony than that required at the time of the alleged rape, in order to convict. Thus, the retroactive application of that rule to an offense appellant was charged to have committed one year earlier, did precisely what the Constitution proscribes.
We are satisfied from a complete review of the record that the trial court committed error by refusing to instruct the jury on the necessity of corroboration in order to convict appellant of the Williamson rape. This finding requires a reversal as to that conviction. Finding no further prejudicial error in the trial court's proceedings, we affirm the remaining convictions.
Affirmed in part and reversed in part.
NOTES
[1] The above charges respectively constitute violations of D.C.Code 1973, §§ 22-2801, -3202; -2901, -3202; -2401, -3202; -2801, -2901, -3202; -2801, -3202; -3502, -2801, -501 and -3202.
[2] Arnold v. United States, D.C.App., 358 A.2d 335 (1976) (en banc).
[3] Since appellant was not convicted of the offenses upon which appellant's fourth and fifth allegations are based, and since there is no showing of prejudice, appellant cannot claim reversible error on those grounds. We, therefore, do not address those issues in this opinion.
[4] Coleman had difficulty identifying the car by exact make or color. She testified that the car was either blue or gray and was not sure of the make.
[5] See discussion of Judge Fickling with respect to ex post facto laws in his opinion for four judges of this court, concurring in part and dissenting in part, in Arnold v. United States, supra at 348.