Gary W. JAGGERS, Appellant,

v.

UNITED STATES, Appellee.

No. 82–332.

District of Columbia Court of Appeals.

Argued April 16, 1984.

Decided Oct. 2, 1984.

Mark S. Carlin, Public Defender Service, Washington, D.C., for appellant. James Klein and Judith Mroczka, Public Defender Service, Washington, D.C., were on the brief, for appellant.

John M. Facciola, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Washington, D.C., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, PRYOR, Associate Judge, and KERN, Associate Judge, Retired.*

---

\* Judge Kern was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on May 25, 1984.

PER CURIAM:

Gary W. Jaggers appeals his convictions for several crimes against three individuals; first-degree burglary while armed (with intent to steal), first-degree burglary while armed (with intent to assault), and armed robbery as regards victim John Nelson; felony murder (robbery), first-degree burglary while armed (with intent to steal) and robbery as regards victim Burwell Davis; and felony murder (rape), first-degree burglary (with intent to steal, and felony murder (robbery) as regards victim Julia Gambill.[1] He contends that he was deprived of his constitutional rights to compulsory process and due process when the trial court permitted a potential defense witness to exercise his Fifth Amendment privilege not to incriminate himself. He also argues that the trial court abused its discretion by failing to sever the Nelson burglary/armed robbery counts, and that improper closing argument by the government denied him a fair trial. We reject his latter two contentions—severance and improper argument—and remand for further proceedings with respect to the Fifth Amendment privilege.

Jaggers was charged with 49 counts of various crimes against the victims. His pretrial motion to sever was granted in part and his trial involved only those counts relating to four of the ten victims. The crimes considered at trial occurred between November 17, 1980, and December 16, 1980, within a four block area in Southeast Washington, D.C. The youngest of the victims was sixty-four years of age.

Jaggers was acquitted of all charges concerning Marie Schneck, who at the time of her death was eighty-one years old. The acquittal was rendered even though the jury heard evidence that when Jaggers was arrested on January 27, 1981, he made a partial confession in connection with the Marie Schneck case to Detective Thomas J. Kilcullen of the Metropolitan Police Department.

Victim Julia Gambill was sixty-four years old and lived at 227 Oakwood Street, S.E. On the evening of December 12, 1980, she was discovered dead by her son under a pile of clothes in her bedroom. Clothing was wrapped around the lower part of her face as a gag, her hands were tied in front of her, and both of her legs were raised and bent in front of her. She was naked from the waist down. She had visible blood in her nostrils and her mouth, and a severely bruised left eye. The autopsy revealed evidence of multiple injuries to the face and head, consistent with kicks or blows from a fist. The blows to her head fractured her skull and she choked to death due to the gag and the blood in her mouth. Examination of her genitalia rendered findings consistent with intercourse without ejaculation. Appellant's latent fingerprint was found on an envelope in Gambill's apartment. Gambill's son, David, testified at trial that their home was "messy"; that they had three cats; that he was storing auto parts in the house; and that he had a briefcase containing magazines such as "Hustler" and "Penthouse."

Jaggers also confessed to the Gambill assault, telling Detective Kilcullen that his "next crime" was another lady on Oakwood Street. He was sitting in a hallway when she came out to get her mail, and he followed her into her house. When she screamed, he shut the door and struck her across her head with his knuckles, knocking her down onto the living room floor. He then told her to get up and go to the bedroom to get him money. As she did, she began to scream again and he again struck her and she fell to the floor. He ran to the kitchen and found her pocketbook on the top of the refrigerator, taking some $.80 which he found in it. He then pulled some auto parts out of a closet next to the kitchen and ransacked the rest of the

1. On these counts, he was sentenced to a total term of confinement of 62 years to life. He subsequently pled guilty to other charges which had been severed and was sentenced to terms totalling 20 years to life consecutive to his other sentence.

apartment. He went back into the bedroom to see if Gambill was still alive. She was breathing heavily as he ran out of the house.

Jagger's reason for going there that day was to get money. He recalled that his victim was "old, gray hair, about 65 year [*sic*]. She was white, she was fat and dirty." He also recalled that the apartment was dirty, with cats running all over the place. He had tied her feet together with handkerchiefs, her hands with scarfs, gagged her with a scarf, and put a cover over her face so she would not see his face. Jaggers also recalled that there were car parts in the living room and a trunk under the couch with "dirty books" in it. He stayed in the apartment for a while looking at these books.

John Lee Nelson was robbed by appellant on the day Julia Gambill was killed, December 12, 1980. Nelson lived three blocks from Gambill. Around 2:00 p.m. Nelson left his apartment to get his mail from the mailbox in the hallway of his apartment. The hallway was well-lit, and Nelson was wearing his glasses. He said "good morning" to the man who passed him and was opening his mail when a robber, whom he later identified as Jaggers, stuck a knife into his ribs and shoved him into his apartment. Jaggers demanded everything Nelson had or "his guts would come out." He also told Nelson that if he continued to talk, he, Jaggers, would do something to him to make sure Nelson could not see. He then struck Nelson, who threw his hand up in front of him to ward off the blow, but the force of the blow caused him to slip and fall to the floor, breaking his hip.

Jaggers remained in the apartment for eight to ten minutes, kicking Nelson whenever Nelson spoke. He went through the dresser in the bedroom and also went through the hallway, living room, dining room and kitchen of the Nelson apartment. He took $285 from Nelson's wallet on a vanity dresser in the bedroom. Later, Nelson found that his watch and a pocket knife, which were lying on a shelf, were gone. When appellant left the apartment, Mr. Nelson somehow got up, went to the door, and yelled for help from his neighbor. The neighbor ran to help him and then called the police. Mr. Nelson's watch was recovered by police from an apartment adjacent to the one in which Jaggers was arrested.

Jaggers likewise partially confessed to the assault on Nelson, telling Detective Kilcullen that after he had left the lady with the cats (Julia Gambill), he went over to LeBaum Street; there he saw both a white man and a black man, who was the janitor. Jaggers entered an apartment, followed by the white man. He pushed the man down and found in the apartment a wallet with $90 in it; he also found a small pocket knife. He denied that he had pulled a knife on the man and explained that he had gone to this apartment because he had gotten nothing from the lady on Oakwood Street and needed the money.

The body of victim Burwell Davis, eighty years old at the time of his murder, was found on December 16, 1980, lying at the bottom of the basement stairs in his home. His face was covered with a nylon stocking, and his body covered with clothing, sheets, blankets and a towel. His head had been wrapped in a brown shirt, and two neckties had been wrapped tightly around his head to keep the shirt in place. One of the neckties was tied over his eyes and the second was tied across his mouth; an electrical cord was tied around his left wrist. There were multiple injuries to the back of his head, and imprints which appeared to be a footprint. The autopsy disclosed that Davis had died around 8 a.m. and had been struck twenty-five to fifty separate blows. An athletic shoe belonging to Jaggers was determined to have made a shoeprint found in the dust in Mr. Davis' home. A stain of blood on Jaggers' athletic shoe was determined to be from a very old individual with type A blood. Davis had type A blood. Davis' son testified at trial that his father kept change in a small dish and a Sony tape

recorder at home and that both were gone when his father's body was discovered.

Jaggers confessed that he had committed another crime around breakfast time in the same block and on the same side of the street as one of the ladies lived (*i.e.*, Gambill or Schneck). He said he had knocked on the door and a man answered. When he asked the man for a glass of water, the man let him in. Jaggers knocked the man down, tied him with a handkerchief and an extension cord which he had ripped off a clock. Jaggers put the man in a living room closet, then "tore the place apart" looking for money. He found $15 in a dresser drawer. When Jaggers ran back downstairs, he dragged Davis out of the closet because Davis was making too much noise; he dragged him into the basement and laid him on the floor. Because Davis was still making too much noise, Jaggers put a handkerchief over his mouth and threw two blankets over him. After going through the house again, ransacking the first floor, appellant ran back downstairs to see if Davis was still alive; he was. Jaggers then cut the cords on Davis' hands and feet, ran back upstairs, and stole two tape recorders. Jaggers recalled that Mr. Davis was about sixty-five years old, five feet nine inches tall and slim. Jaggers was wearing the same clothes he had worn when he robbed the ladies, including his blue and white Nike athletic shoes.

At trial defense counsel argued that the oral and written statements Jaggers gave to Detective Kilcullen after his arrest were not freely and voluntarily given, but were the product of police pressure exerted on an exhausted, terror-stricken young man,[2] and that they were both involuntary and unreliable as the products of illegal drug use by Jaggers on the evening of his arrest. In support of this assertion defense counsel expressed an intention to call as a witness Raymond Stoddard, a juvenile, who had been arrested with Jaggers. Defense

counsel proffered that Stoddard would testify that before the arrest he and Jaggers ingested cocaine, marijuana and PCP (phencyclidine). The trial court appointed a lawyer to represent Stoddard, and after consultation, Stoddard claimed his Fifth Amendment privilege not to incriminate himself if called as a witness. The defense requested that the appropriate prosecuting authority—the Office of Corporation Counsel—grant immunity to Stoddard so that his testimony would be available to Jaggers. The Office of Corporation Counsel responded by indicating that it would consider granting immunity only if Stoddard requested it. Stoddard declined to make such a request and chose to assert his Fifth Amendment privilege instead. The trial court upheld the claim of privilege and denied Jaggers' motion for a grant of judicial immunity for Stoddard.

Jaggers now contends that his constitutional rights to compulsory process and due process were violated when the trial court sustained Stoddard's invocation of the Fifth Amendment privilege. Jaggers argues that because the confession was a major component of the government's evidence against him, and because Stoddard's testimony was expected to reveal information relevant to the admissibility and reliability of the confession, the trial court did not fulfill its obligation to protect Jaggers' constitutional rights when it failed to ensure that Stoddard's testimony was compelled.

At the turn of this century, the Supreme Court enunciated the Fifth Amendment privilege as follows:

> The object of the amendment is to establish in express language and upon a firm basis the general principle of English and American jurisprudence, that no one shall be compelled to give testimony which may expose him to prosecution for crime. It is not declared that he may not be compelled to testify to facts which

---

**2.** Jaggers was arrested at 4 a.m. on January 27, 1981, by 12 police, including 5 homicide detectives, who, after knocking, burst through the door with a battering ram with guns drawn. Jaggers was seventeen years old at the time of his arrest.

may impair his reputation for probity, or even tend to disgrace him, but the line is drawn at testimony that may expose him to prosecution.

*Hale v. Henkel,* 201 U.S. 43, 66–67, 26 S.Ct. 370, 375–76, 50 L.Ed. 652 (1906).

Later, the Court in explicating the privilege, stated:

During the trial of Aaron Burr, and *In re Willie,* 25 Fed.Cas. No. 14,692e, pp. 38, 39, the witness was required to answer notwithstanding his refusal upon the ground that he might thereby incriminate himself. Chief Justice Marshall announced the applicable doctrine as follows: "When two principles come in conflict with each other, the court must give them both a reasonable construction, so as to preserve them both to a reasonable extent. The principle which entitles the United States to the testimony of every citizen, and the principle by which every witness is privileged not to accuse himself, can neither of them be entirely disregarded. They are believed both to be preserved to a reasonable extent, and according to the true intention of the rule and of the exception to that rule by observing that course which it is conceived courts have generally observed. It is this: When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. If a direct answer to it may criminate himself, then he must be the sole judge what his answer would be."

The constitutional protection against self-incrimination "is confined to real danger and does not extend to remote possibilities out of the ordinary course of law." *Heike v. United States,* 227 U.S. 131, 144, 33 S.Ct. 226, 228, 57 L.Ed. 450; *Brown v. Walker,* 161 U.S. 591, 599, 600, 16 S.Ct. 644, 648, 40 L.Ed. 819.

In *The Queen v. Boyes* (1861) 1 B. & S. 311, 329, 330, Cockburn, Ch. J., said:

"It was also contended that a bare possibility of legal peril was sufficient to entitle a witness to protection; nay, further, that the witness was the sole judge as to whether his evidence would bring him into danger of the law; and that the statement on his belief to that effect, if not manifestly made *mala fide,* should be received as conclusive. With the latter of these propositions we are altogether unable to concur.... To entitle a party called as a witness to the privilege of silence, the Court must see, from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is reasonable ground to apprehend danger to the witness from his being compelled to answer. We indeed quite agree that, if the fact of the witness being in danger be once made to appear, great latitude should be allowed to him in judging for himself of the effect of any particular question: ... A question which might appear at first sight a very innocent one might, by affording a link in a chain of evidence, become the means of bringing home an offense to the party answering. Subject to this reservation, a Judge is, in our opinion, bound to insist on a witness answering unless he is satisfied that the answer will tend to place the witness in peril.

"Further than this, we are of opinion that the danger to be apprehended must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things—not a danger of any imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. We think that a merely remote and naked possibility, out of the ordinary course of the law and such as no reasonable man would be affected by, should not be suffered to obstruct the administration of justice. The object of the law is to afford to a party, called upon to give evidence in a proceeding *inter alios,*

protection against being brought by means of his own evidence within the penalties of the law. But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice." *Mason v. United States*, 244 U.S. 362, 364–66, 37 S.Ct. 621, 622–23, 61 L.Ed. 1198 (1917). More recently the Court said:

The Fifth Amendment declares in part that "No person ... shall be compelled in any criminal case to be a witness against himself." This guarantee against testimonial compulsion, like other provisions of the Bill of Rights, "was added to the original Constitution in the conviction that too high a price may be paid even for the unhampered enforcement of the criminal law and that, in its attainment, other social objects of a free society should not be sacrificed." *Feldman v. United States*, 322 U.S. 487, 489, 64 S.Ct. 1082, 1083, 88 L.Ed. 1408 (1944). This provision of the Amendment must be accorded liberal construction in favor of the right it was intended to secure. *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892). *Arndstein v. McCarthy*, 254 U.S. 71, 72–73, 41 S.Ct. 26, 27, 65 L.Ed. 128 (1920).

The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. (*Patricia*) *Blau v. United States*, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950). But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. *Mason v. United States*, 244 U.S. 362, 365, 37 S.Ct. 621, 622, 61 L.Ed. 1198 (1917), and cases cited. The witness is not exonerated from answering merely because he declares that

in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, *Rogers v. United States*, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951), and to require him to answer if "it clearly appears to the court that he is mistaken." *Temple v. Commonwealth*, 75 Va. 892, 899 (1881). However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." *See* Taft, J., in *Ex parte Irvine*, 74 F. 954, 960 (C.C.S.D.Ohio, 1896).

*Hoffman v. United States*, 341 U.S. 479, 485–87, 71 S.Ct. 814, 817–19, 95 L.Ed. 1118 (1951).

On the other hand, the Sixth Amendment guarantees to a defendant the right to compulsory process for obtaining witnesses in his behalf. In holding that this provision of the Sixth Amendment was applicable to the states under the due process clause of the Fourteenth Amendment, the Court said:

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has

the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967).

■■■ Where the defendant's Sixth Amendment right to call a witness is met by that witness invoking the Fifth Amendment privilege, the court must determine "whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *Marchetti v. United States,* 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968) (citation omitted). In the language of Chief Justice Marshall in the Aaron Burr case, quoted in *Mason v. United States, supra,* 244 U.S. at 364, 37 S.Ct. at 622, "When two principles come in conflict with each other, the court must give them both a reasonable construction, so as to preserve them both to a reasonable extent." However, it is only when there is an actual conflict that there is the need to search for a reasonable accommodation.[3] Thus, if the witness has already been convicted of the offense on which he would incriminate himself, he has no privilege. *United States v. Pardo,* 204 U.S.App.D.C. 263, 271, 636 F.2d 535, 543 (1980). Nor does the privilege exist where the statute of limitations has run or for which there has been a proper grant of immunity. *Hale v. Henkel, supra,* 201 U.S. at 67, 26 S.Ct. at 376. This is so, for in those cases there is an absolute legal barrier to prosecution. Likewise, there is no privilege if there has been a valid prior waiver thereof. *Salim v. United States,* 480 A.2d 710 (D.C. 1984). Since there is no contention that Stoddard had waived the privilege, one of the questions we must address to resolve the issue presented in this case is whether an absolute legal barrier to prosecution must exist before a witness can be compelled to testify in face of his claim of privilege. We think not. Rather, we think the issue is properly phrased in the opinion

of the United States Court of Appeals for this circuit where the court held:

> If testimony is incriminatory, *i.e.,* tending to show that the witness has engaged in criminal activities, then the propriety of invoking the fifth amendment privilege depends on whether the risk of prosecution is substantial and real and not merely fanciful. *Zicarelli v. New Jersey State Commission of Investigation,* 406 U.S. 472, 478, 92 S.Ct. 1670, 1675, 32 L.Ed.2d 234 (1972); *Marchetti v. United States,* 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968); *Hoffman, supra; Franey,* 620 F.2d [1086] at 1091–92; *In re Folding Carton Antitrust Litigation,* 609 F.2d 867, 871 (7th Cir.1979). When a witness can demonstrate a fear of prosecution, which is more than fanciful or merely speculative, he has a claim of privilege that meets constitutional muster. *Id.*

*In re Corrugated Container Antitrust Litigation,* 213 U.S.App.D.C. 319, 327, 662 F.2d 875, 883 (1981). We have held likewise. *In re Jerry Neal,* 475 A.2d 390, 392 (D.C.1984).

■■■ The record in this case discloses that the trial court considered only the first prong of the two prong test, *i.e.,* whether the testimony was incriminatory and did not focus also on the second prong of "whether the risk of prosecution is substantial and real and not merely fanciful." *In re Corrugated Container Antitrust Litigation, supra,* 213 U.S.App.D.C. at 327, 662 F.2d at 883.

In sustaining the privilege in this case, the trial court stated:

> THE COURT: On that point you can't get around it that his presence and participation in the event of that particular morning or evening with the defendant in a situation where there was a criminal activity, there's no way that the Court can preclude the Government from in-

---

**3.** Where there is an irreconcilable conflict between a witness' valid Fifth Amendment privilege and a defendant's right to call a witness

protected by the Sixth Amendment, the Fifth Amendment rights prevail. *Alston v. United States,* 383 A.2d 307, 310 (D.C.1978).

quiring into the circumstances surrounding those activities.

It's obvious if the activities which you indicate are true and/or that the witness would have to testify to that, were he required to do so, in that it would be proffered to explore the circumstances under which this was being done and how it came about and so forth.

You may recall the testimony of the defendant during the motions hearing which indicated quite a bit about attaining such items. This witness very well may have to respond to the same types of inquiry or should, it being proper to cross examine, it's not just a collateral issue and I couldn't preclude the Government from that type of confrontation and therefore, I would have to allow them to do that. And clearly, it would produce incriminating matters which would furnish a link which would possibly support some type of prosecution. And the witness should not be required to have that happen to him. He's entitled to invoke the privilege and I find no way to exclude it as to that particular part of the transaction.

The court was correct that if Stoddard testified in accordance with the proffer made by Jaggers, given the permissible scope of cross-examination,[4] the first prong of the test would be satisfied. Jaggers contends that there was a legal impossibility of prosecuting Stoddard based on his projected testimony because the government had no evidence to satisfy the requirement of corroborating such a judicial admission. *See Opper v. United States*, 348 U.S. 84, 91, 75 S.Ct. 158, 163, 99 L.Ed. 101 (1954); *In re R.A.B.*, 399 A.2d 81, 83 (D.C.1979).[5]

Let us summarize the record as it existed before the trial court when it sustained the privilege asserted by Stoddard. Jaggers and Stoddard were arrested on January 27, 1981. No drugs or drug paraphernalia were seized. When Jaggers sought to call Stoddard as a witness at his trial, no prosecution of Stoddard had been instituted by the Corporation Counsel despite the lapse of approximately twenty-two months. The Corporation Counsel, when asked by counsel for Jaggers to agree not to prosecute, Stoddard stated that they would consider entering such an agreement if requested to do so by Stoddard. Stoddard, on the advice of counsel, declined to do so. The court declined the request by Jaggers that the court request the Corporation Counsel to agree not to prosecute Stoddard. The court ruled, properly, that if Stoddard testified about Jaggers' drug use on the day in question, cross-examination would be permitted as to Stoddard's contemporaneous drug usage. If, as anticipated, his testimony incriminated him, and, if after such a lapse of time the Corporation Counsel elected to prosecute Stoddard, Jaggers would have to be a witness to meet the *Opper* requirement. In such an event, Jaggers' Fifth Amendment rights would have to be determined.

Since it is the trial court, rather than this court, which should rule in the first instance on both prongs of the test for the privilege, we deem it proper to remand to the trial court for that purpose. *Davis v. United States*, 482 A.2d 783 (D.C.1984); *Salim v. United States, supra.* On remand, the trial court, after any appropriate hearing, shall rule on the second prong of the test for the privilege.[6] If the court sustains the privilege, its task is complete. If, however, the court determines that the

---

4. We thus reject Jaggers' contention that the court erred in ruling that Stoddard could be cross-examined about his contemporaneous drug use. *See Alston v. United States, supra* note 3; *see also United States v. Pardo, supra.*

5. *While the* corroborative evidence "need not be sufficient, independent of a confession, to establish all elements of the crime ... [it must] show

sufficient corroborating information so that, when combined with the confession, guilt is established." *Harrison v. United States*, 281 A.2d 222, 225 (D.C.1971).

6. The second prong is not to be equated with an inquiry regarding the prosecutor's state of mind.

privilege was not properly invoked, then the court must take the testimony of Stoddard. Based on the prior evidence on the issue of voluntariness as supplemented by the testimony of Stoddard, the trial judge must determine if the confession was voluntary and should have been introduced into evidence. *See Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). If the confession is found to be voluntary, the trial court must then determine whether the omission of Stoddard's testimony at trial contributed to the jury's determination beyond a reasonable doubt. In other words, the trial court must determine whether the government has demonstrated that the omission of Stoddard's testimony at trial was harmless error using the standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Cf. Tabron v. United States*, 410 A.2d 209 (D.C.1979); *Ibn-Tamas v. United States*, 407 A.2d 626 (D.C.1979).[7]

Jaggers also contends that the trial court erred by refusing to sever the Nelson armed robbery/armed burglary counts from the other charges against him. We find this contention to be unpersuasive.

Jaggers was indicted on 49 counts of various crimes committed against ten victims who lived within a two mile area in Southeast Washington during the period of October 3, 1980, through January 1, 1981. Prior to trial Jaggers moved for severance, seeking a separate trial as to each victim. The trial court ruled that although all counts except 6 could be properly joined because of their similarities, the prejudice to appellant caused by having to defend so many charges at once made further severance appropriate. The court severed the 49 counts into 4 groups. At trial of the counts in this appeal, the court denied the government's motion relying on *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), and its progeny to introduce evidence of some of the crimes not being

tried as other crimes evidence. Evidence at appellant's trial was strictly limited to the crimes being tried.

The government presented its evidence concerning the crimes against each of the four victims seriatim and in a separate and distinct manner. The trial judge found that the jury would be able to keep evidence of each crime separate and distinct. This finding was proven accurate by the jury's ultimate acquittal on all counts as to Marie Schneck.

 We have approved joinder where "the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass ...." *Bridges v. United States*, 381 A.2d 1073, 1074 (D.C.1977). In this instance, the evidence of the allegations against Jaggers were, although similar in nature, separate and distinct. To justify reversal, Jaggers must establish that the jury amassed the evidence into a single inculpatory whole. He must demonstrate that the joint trial subjected him to the "most compelling prejudice." *Wheeler v. United States*, 470 A.2d 761, 765 (D.C. 1983) (quoting *Robinson v. United States*, 452 A.2d 354, 358 (D.C.1982)). No such prejudice has been demonstrated. We are satisfied that this joinder of counts did not work undue prejudice against Jaggers. It is evident from the verdict that the jurors were able to keep separate in their minds the evidence as to each offense and return selective verdicts on different counts. *See Bowyer v. United States*, 422 A.2d 973, 977 (D.C.1980).

Finally, Jaggers contends that improper closing and rebuttal argument by the prosecutor denied him a fair trial. He complains of the prosecutor's statements describing him and his crimes (*e.g.*, "terror of Oakwood Street," "crimes of unspeakable horror and violence"), the prosecutor's il-

---

**7.** Given our resolution of this issue, we need not address at this time Jaggers' contentions re judicial granting of immunity. *See Government of Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980); Note, *The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses*, 91 Harv.L.Rev. 1266 (1978).

lustration of how Jaggers killed Burwell Davis (3 stomping movements), the prosecutor's casting of a contest between the testimony of government expert witnesses and the arguments of defense counsel (*e.g.,* "who are you going to believe there, Doctor Kim or Mr. Bellows"), and the prosecutor's suggestion that cross-examination by defense counsel had been unfair (*e.g.,* "Mr. Bellows would confuse any witness").

■ In ruling upon this contention, "we must determine whether misconduct occurred and, if so, whether it created 'substantial prejudice' to Jaggers." *(Duane) Dyson v. United States,* 450 A.2d 432, 437 (D.C.1982).

We agree with appellant that the prosecutor exceeded the bounds of proper advocacy as regards his attempt to create a credibility contest between the defense attorney and the government's expert witnesses, and his suggestions that defense counsel's cross-examination of government witnesses was unfair. We conclude, however, that appellant has failed to demonstrate that this improper conduct created prejudice substantial enough to warrant reversal.

■ The standard we apply in making this determination is that of nonconstitutional harmless error: "whether we can say 'with fair assurance, after pondering all that has happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *(Phillip) Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

The evidence against appellant was quite substantial. There was a confession,[8] physical evidence, and an identification by

the surviving victim. We do not believe the misconduct at issue here was so serious as to sway the jury. "We have noted before that we credit juries 'with enough common sense and discrimination to enable them to evaluate properly conduct and remarks of counsel even when they offend the ordinary standards of propriety.'" *(Duane) Dyson v. United States, supra,* 450 A.2d at 438 (quoting *Smith v. United States,* 315 A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974)).

*Case is remanded for proceedings in accordance with this opinion.*[9]

NEWMAN, Chief Judge, concurring:

I join fully the Per Curiam opinion and write briefly to add the following which the trial court may find helpful in its analysis on remand.

Although the record shows that no drug or drug paraphernalia were seized at the time of the arrest, this record does not present a case of an absolute bar to prosecution based on the corroboration requirement. The record discloses that Jaggers testified as follows at the hearing on the motion to suppress his confession:

Q. Now, at the time that you were down at the police station that morning, were you under the influence of any drugs or alcohol?

A. Yes, I was.

Q. And could you tell the Court what drugs, if any, you had taken?

A. I took a gram of cocaine that night.

Q. What time that night?

A. Approximately 1:00 a.m.

Q. And how did that make you feel, say about 5:30 or 6:00 a.m. in the morning?

---

**8.** We need not decide whether we would reach the same result without the confession, for, if on remand the confession is determined to be inadmissible, a new trial must occur anyway.

**9.** The government concedes that on remand, one of the felony murder convictions as to Gam-

bill and one of the burglary convictions as to Nelson must be vacated. *See Garris v. United States,* 465 A.2d 817 (D.C.1983), and *Thorne v. United States,* 471 A.2d 247 (D.C.1983), respectively.

A. Unstable person can't think very clearly, makes you hallucinate sometimes, depends on how much you take.

Further, the record indicates a proffer by Jaggers that the records of the Pre-trial Services Agency reflect that Jaggers told an interviewer for that agency that he had used cocaine on the day of his arrest.

In any prosecution of Stoddard, these statements would be inadmissible hearsay; *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). To provide the corroboration required by our decisions, the prosecution would have to attempt to call Jaggers as a witness at the trial of Stoddard. In such event, Jaggers could seek to invoke his Fifth Amendment privilege. Since his prior trial testimony and statement to the Pre-trial Service examiner were in a different proceeding, he has not waived his privilege. *Salim v. United States, supra,* at 714, 715; *Ellis v. United States,* 135 U.S.App.D.C. 35, 416 F.2d 791 (1969). Thus Jaggers would meet the first prong of the test for invoking the privilege. The court would then be required to address the second prong. If it determines against Jaggers on this point, he could be ordered to testify. If the court sustained the privilege, the Corporation Counsel could seek an immunity grant by the United States.

No reason appears of record for the court declining to request the Corporation Counsel not to prosecute in the case presently before us, and none has been suggested to us. While the Office of the Corporation Counsel does not have statutory authority to grant immunity, its agreement not to prosecute is a fundamental equivalent thereof. Of course, a witness who has received a grant of immunity does not have the right to refuse to testify. *United States v. Mandujano,* 425 U.S. 564, 575, 96 S.Ct. 1768, 1776, 48 L.Ed.2d 212 (1976).

Since the government has the burden of proof on this issue on remand, *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), mandates that it must bear the burden of witness unavailability, failed memory since the time of trial, or other impediment to the taking of Stoddard's testimony.

KERN, Associate Judge, Retired, dissenting:

The majority declines to affirm the convictions of appellant, a self-confessed murderer and rapist, who was tried and convicted by a jury after a trial which fills some 2,000 pages of transcript in the record before us. Since the defense presented but one witness (whose testimony was aimed solely at rebutting the incriminating inference from the discovery by police of an article stolen from one of the victims and found in appellant's room), the prosecution consumed most of the trial transcript with a painstaking presentation of a painfully detailed series of grim events that terrorized a four-block area in Southeast Washington for a period of some three weeks with brutal physical attacks on and thefts from elderly residents;[1] and, required the police to mobilize a special task force to apprehend the killer.

Near the close of this trial, the defense sought to present one other witness—a *surprise* witness in the sense that he was not introduced to the jury as the trial commenced and an *unknown* witness to both sides, apparently, because his address was unknown either to the defense or to the prosecution.

This prospective witness was a juvenile who admittedly had a record of incarceration and abscondence and who lived in the abandoned building which the appellant from time to time inhabited. Indeed, on the night of appellant's arrest by the police, this witness was in the building with his mother and siblings. Defense counsel represented that the witness "will testify that he used cocaine, marijuana and PCP on the night of January 27th [the date of appellant's arrest] with [appellant]."

---

1. One such elderly victim survived a brutal beating to identify appellant as his assailant.

The purpose of this proffer was to rebut the prosecution testimony that appellant had rendered his post-arrest confessions of the gruesome crimes he had committed knowingly and voluntarily without any signs of mental impairment as the result of any recent ingestion of narcotics.

Upon hearing this proffer, the experienced trial judge announced "I will appoint a lawyer for him" and commented concerning the role of such court-appointed counsel that the witness should be advised of his rights and a determination made if he wishes to waive his rights to testify. Defense counsel then reported to the court that the witness, who had been under subpoena and had earlier reported to the courthouse, was nowhere to be found, and that "maybe he [the witness] made a decision concerning the assertion of his Fifth Amendment rights." A bench warrant was thereupon issued for the then missing witness.

Later, the witness appeared and the court appointed an attorney and instructed him as follows:

THE COURT: Step up Mr. Stoddard. The Court has appointed Mr. Greenspan to represent you and to advise you if you had any rights and if you did, whether you wish to give up those rights. Have you talked to him?

MR. STODDARD: Yes, ma'am.

MR. GREENSPAN: I spoke to Mr. Stoddard and I discussed with him what would be his testimony and based on that testimony I advised him that he had a right not to take the stand, not to incriminate himself. And he has chosen to exercise that privilege.

 \* \* \* \* \* \*

THE COURT: Well, the Court would place him under oath and let him plead the Fifth Amendment, if he wishes to do so.

MR. BOWMAN: Fine. He would do it himself.

THE COURT: Would you explain to him what we are going to do? We have to determine that he will in fact invoke the Fifth privilege and he will have to be sworn. It will have to come out of the presence of the jury and you can inform him how to do that.

MR. GREENSPAN: The Judge is going to put you under oath and you will be obligated to tell the truth. You are going to be asked to be put on the witness stand and identify yourself. You are going to be asked if you wish to testify as a witness in this case. This is a matter you and I previously discussed.

THE COURT: He may be asked other questions by defense counsel to which you may advise him—invoke, if he wishes to do so.

Thereafter, the defense counsel began to weave the web of confusion which has ensnared the majority and invalidated the jurors' convictions of appellant for his murderous and rapacious misconduct after such a lengthy and thorough trial. Thus, counsel stated:

I suggest to the court that the government does not have a good faith basis to believe a Fifth Amendment privilege would lie.

The court responded:

I thought you told me he [the witness] was involved with these drugs, in possession and was a user of them.

Defense counsel thereupon agreed that he had so stated:

Yes, Your Honor. I believe it's the government's position that that's a lie ... that there were not drugs involved at all ...

The prosecutor then unequivocally stated:

My position is that the proffer was ... Mr. Jaggers [appellant] and Mr. Stoddard [the witness] [were] both using drugs illegally the night before the arrest.

The court then commented:

Your position is there was drug use and Mr. Stoddard was involved in that drug

use and possession of those drugs, that was your representation.

The defense attorney commented:

... that the court could also address the question of whether even if he [the witness] says I used drugs that night, whether that would in fact be a self-incriminating statement.

The court responded: "Have they legalized it?" Defense counsel replied:

No, but there were no drugs seized that night, according to the testimony in this court and so [the witness'] uncorroborated testimony that he used drugs that night we would say would not make him liable for prosecution.

At this point, the witness' court-appointed attorney stated:

Uncorroborated confession may not be sufficient to convict. However, it probably would be sufficient to get to the point, at least, where jeopardy was attached and based on other materials that may come out on cross-examination ... could possibly ... be corroboration and not much corroboration is needed to validate an otherwise uncorroborated confession. I would think there'd be a privilege in this situation.

The court called the prospective witness out of the presence of the jury so "we can conduct a limited inquiry to see what the witness would have testified to and you can inquire so we can see whether he invokes the privilege."

Thereafter, the witness was sworn and, out of the jury's presence, recounted how he had lived in an apartment in "an abandoned house" and appellant had "off and on" stayed in another apartment there next door. The witness, in response to a question asked by defense counsel, testified that he recalled the day (January 27, 1981) upon which appellant was arrested because he himself was "locked up" on the same day. When asked whether he had observed appellant "in the early morning hours" of that day "sniffing cocaine, smoking marijuana, and using PCP", the witness refused to answer "on the grounds I might be incriminating myself." Given the defense proffer earlier that the witness would testify that *he and appellant* were together on January 27, 1981, using illicit drugs, *viz.*, cocaine and PCP, and given the further fact that the witness had been advised by counsel, it is clear that the witness' refusal was proper. Otherwise, had he been required to answer that question he would clearly have provided a link in the chain of his own prosecution.

Defense counsel continued his questioning by asking whether the witness "prior to January 27th of 1981" had seen appellant "in possession of any illegal drugs." Again, the witness refused to answer the question "on the ground that I may be incriminating myself." Again, it is clear that given the witness' drug use with appellant he would have criminally implicated himself by his testimony concerning appellant's prior use of such drugs.

At that point, defense counsel complained that the witness did not understand "what he's doing." The attorney representing the witness commented that "[h]e has a genuine belief he'd be incriminated," and the court replied, "[h]e [the witness] has the advice of counsel to help him make that determination as to whether or not he believes it would incriminate him. We are extracting answers from him under oath."

Defense counsel then changed his tack and questioned the witness concerning "his observations at the police station of [appellant] and the police." When the witness invoked the Fifth Amendment in answer to the question whether he was "at any point in the same room" as appellant at the Homicide Office a colloquy between the court and all counsel ensued and the court thereafter adjourned proceedings overnight during which the court invited appointed counsel for the witness "to continue talking to your client."

When the trial resumed the next day defense counsel proceeded to sow the seed which has mushroomed into the majority's

misguided invalidation of the convictions by its order of remand:

> [I]t's our position there is no way in the world he [the witness] could ever be convicted for possession of drugs, even if he gets on the stand and says I had drugs and used drugs on that day. This would just be his own uncorroborated confession ...

Defense counsel continued:

> [T]here's never been a case where it's gone past a motion for judgment of acquittal.

The prosecutor responded by referring to the Supreme Court's decision in *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), which is binding upon this court: That a trial court should not deny a witness protection of the Fifth Amendment unless it's perfectly clear that the witness' answer cannot possibly incriminate him. The prosecutor pointed out what was obvious to all in the courtroom, but of which the majority is apparently oblivious: The witness' answer that he had drugs in his possession on the night of the arrest could implicate him with respect to a charge of possession of drugs. The prosecutor further pointed out—quite correctly—that neither he nor defense counsel was in a position to say whether or not the witness would be prosecuted but "he does face a danger of prosecution from admitting he had drugs in his possession on that evening."

The witness' counsel called the trial court's attention to *Alston v. United States*, 383 A.2d 307 (D.C.1978), which the majority appears to forget is binding on this Division in this case and stated to the court:

> The privilege afforded by the Fifth Amendment encompasses testimony which might further a link in the chain of evidence necessary for a prosecution. The answer need not in itself furnish all the evidence that is necessary for a prosecution.

*The trial court,* having heard all counsel, ruled:

> [T]he Court is satisfied that the witness has the right to invoke the privilege and a privilege exists.

> [I]t's only necessary that answers would further a link in the chain of evidence needed to prosecute the witness for a crime ... if the witness were required to answer regarding the circumstances under which he was in possession of any types of drugs on this given occasion.

Subsequently, the trial court reiterated its ruling on the proffered testimony of the witness concerning use of illegal drugs by appellant and himself on the night of the arrest:

> And clearly, it would produce incriminating matters which would furnish a link which would possibly support some type of prosecution. And the witness should not be required to have that happen to him. He's entitled to invoke the privilege ....

With all deference, the majority has failed to apprehend either the record in the instant case or the legal precedent binding upon us. The result is sad to behold: First, the future invocation of the Fifth Amendment by other witnesses to come before the courts is undermined, *see In re Corrugated Container Antitrust Litigation*, 213 U.S.App.D.C. 319, 327, 662 F.2d 875, 883 (1981); and second, the trial court in this case, where the murders occurred in 1980, the arrest of appellant was effected in early 1981, and the trial of appellant was held in late 1981, is now required to take some further action of an undefined nature with respect to a witness whose whereabouts was unknown to the parties as they went to trial, who was living in an abandoned building in 1980 between incarcerations and escapes and who left the courthouse, unexcused, while the trial was in progress and he was under subpoena. Given these circumstances, the ability to prosecute appellant is highly doubtful.

I deem the remand to be based upon "fanciful" and "merely speculative" concerns, and I dissent.