James Earl COX, Appellant,

v.

UNITED STATES, Appellee.

No. 82–830.

District of Columbia Court of Appeals.

Argued Oct. 30, 1984.

Decided Sept. 19, 1985.

Mark S. Carlin, Public Defender Service, Washington, D.C., with whom James Klein and Susan L. Schneider, Public Defender Service, Washington, D.C., were on the briefs, for appellant.

John M. Facciola, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell, and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, BELSON and ROGERS, Associate Judges.

BELSON, Associate Judge:

A jury found appellant guilty of eight counts arising out of two separate sexual assaults and his later possession of a weapon.[1] Appellant challenges his convictions relating to the first two incidents on the grounds that the trial judge improperly refused to sever the counts arising respectively from the two sexual assault incidents and that the prosecutor's closing argument denied appellant his right to a fair trial. We affirm.

I

We will set forth the facts in some detail because we will later weigh the evidence of

---

1. The convictions were for armed robbery, D.C. Code § 22–2901, –3202 (1981 & Supp.1984), armed rape, *id.* §§ 22–2801, –3202, and sodomy, *id.* § 22–3502, stemming from the events of October 26, 1981; two counts of kidnapping while armed, *id.* §§ 22–2101, –3202, assault with intent to commit robbery while armed, *id.* §§ 22–501, –3202, and armed rape, *id.* §§ 2801, –3202, arising out of events of October 28, 1981; and carrying a pistol without a license, *id.* § 22–3204, on November 10, 1981.

guilt as part of a harmless error analysis. The first complainant was walking along Fort Davis Drive, S.E., through wooded parkland at about 2:30 p.m. on October 26, 1981. After walking for approximately 10 minutes, complainant noticed a man on the same side of the street. When she first observed the man, she was 20 to 30 feet from him and she looked directly at his face. Complainant crossed to the other side of the street. She noticed that the man turned his back to her in a "jittery" motion. The man then ran across the street toward complainant. Again complainant looked directly into his face. When he reached her, she found herself staring into his face from a distance of about 2 feet. In all, complainant looked directly at the man for about 15 seconds. The man grabbed complainant from her right side, and put a gun to her side. He then pulled her back across the street and pushed her into the woods. The man demanded that complainant hand over her money and he removed her watch and rings. He tied her hands behind her back with a rope.

Her assailant forced complainant to walk farther into the woods, with her back towards him. He untied her hands and directed her to remove her clothes, so that he "could get away." Upon his command, complainant lay face down on the ground. The man instructed her not to look at him, and he put a sweater over her face. He then gave her a choice between committing oral sodomy on him or being raped. She did the former, but he nevertheless proceeded to rape her with her sweater over her face. During the rape, complainant was able to see part of the man's face for about a second when the sweater over her face moved.

The man then stood up, telling complainant to wait 10 minutes before she left. Moments later, however, the man returned and again sodomized and raped complainant. He left again, repeating the warning that complainant wait 10 minutes. Complainant, after waiting as instructed, dressed and walked back to the road where she soon thereafter flagged down a passing police car.

Complainant described her assailant as a black male, 27 to 28 years old, 5'10" to 6' tall, 155 to 165 pounds, thin, with a mustache, wearing a puffy, down-type jacket, which was brown or tannish, and carrying a small handgun.

Complainant's sister, on the day of the assault, had watched from her home as complainant walked down Fort Davis Drive. She noticed a car slowing down as it approached her sister, and again slowing down after it passed her. Complainant's sister was concerned for her sister's safety because she considered it unusual that a car would slow down twice within a short distance. Complainant's sister described that car as "brownish-greenish" with a very dull finish. It was an older two-door, similar to an Oldsmobile 442, with a dark interior. Only the driver's seat was occupied.

The second rape occurred on the evening of October 28, 1981. The second complainant was walking home from a bus stop on Southern Avenue, S.E., about one mile from where the first rape had occurred, when a man stuck a small black revolver to her side and announced a stick-up. The man forced complainant into his parked car. Complainant lay face down as directed on the back seat. She did not look up because the man said he would shoot her if she did. The man drove complainant to a spot in a wooded area off of a road. He told her to take off her clothes so he could check them for money. The man discovered that complainant only had a small amount of change, and threw it in the back seat. He climbed into the back seat, placed complainant's pants over her eyes, and raped her. At one point, the man put the gun to complainant's head to quiet her. After the rape, the man opened the passenger-side door and told complainant to get out. He instructed her to keep walking toward the woods until she heard his car pull off. She did so, then returned to the

road, and eventually found someone who called the police. The park police met complainant at Fort Dupont Park, the scene of the rape.

The complainant told the police that the man who raped her wore an insulated "down" jacket, pants, black shoes, and skull cap. He was black, 5′10″ to 6′ tall, medium build, and 27 to 28 years old. She also said that the car in which she had been raped was a dirty, two-toned American car, which was at least 10 years old. The bottom of the car appeared to be brown and the top was of a dark vinyl material. The car had a dark interior and bucket seats with a console between them. Complainant also noticed a white license tag with the number 3 lying face down on the back seat floor of the passenger side of the car.

Less than 2 weeks later, Park Police detectives, sighted appellant in a two-door, "olive-brown" Oldsmobile Cutlass with a black vinyl roof at Southern Avenue and Marlboro Pike, one block from where the second complainant had been abducted. Appellant matched the general descriptions given by both complainants. Appellant, after speeding off and running a red light, was stopped by the detectives. One of the detectives noticed a rope hanging from appellant's jacket, and asked him to follow the detective to Park Police headquarters. At headquarters, appellant agreed to a search of his car. The Police retrieved a .32 caliber loaded pistol, and found a white license plate, numbered "HR 5033" lying face down behind the passenger seat. Appellant was then arrested.

The first complainant picked appellant's photograph from an array of eight photographs the day after appellant was arrested. On November 18, 1981, she identified appellant from a lineup. She identified appellant at trial, stating that she had no doubt in her mind that he was her assailant. The first complainant also indicated that the gun found in appellant's car looked like the gun used during the rape and robbery, that the jacket appellant was wearing when he was arrested looked exactly like the hooded, brown, puffy jacket worn by her assailant, and the rope found on appellant was the same length and type of rope used to tie her hands.

The first complainant's sister selected appellant's car from approximately 18 cars parked in the impoundment lot, as looking similar to the car she saw from her window the day her sister was raped.

The second complainant, in contrast, explained that she did not think she would recognize her assailant if she saw him again because she had only glanced at him when he walked toward her on the sidewalk, he had later covered her eyes, and had threatened to kill her if she looked at him. Thus, she was not able to identify appellant at the lineup and she did not make an in-court identification.

The second complainant was able, however, to identify the car in which she was raped. She selected two photographs of appellant's car, shown to her by the police, and also identified appellant's car at the police impoundment lot. She also identified the gun taken from appellant on November 18 as the gun used by her assailant.

Appellant was charged with the October 26 and 28 rapes and related offenses, and with carrying a pistol without a license on November 10, 1981. Appellant filed a pretrial motion for severance under Super.Ct. Crim.R. 14.[2] The government opposed sev-

2. That rule permits relief from prejudicial joinder:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the Court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

> In ruling on a motion by a defendant for severance the Court may order the prosecutor to deliver to the Court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

The defense also argued that the offenses were misjoined under Super.Ct.Crim.R. 8(a).

erance. After oral argument, the trial judge denied appellant's severance motion.

## II

 Appellant argues that the trial court abused its discretion by denying the motion for severance of the counts relating to the two rape incidents. This court will overturn the trial court's decision to deny a motion for severance only when the appellant makes a clear showing that the trial court has abused its broad discretion. *Brooks v. United States*, 448 A.2d 253, 257 (D.C.1982); *Arnold v. United States*, 358 A.2d 335, 339 (D.C.1976) (en banc). When offenses "of the same or similar character," Super.Ct.Crim.R. 8(a), are properly joined, however, there exists a "substantial risk of prejudice" to the defendant. *Bridges v. United States*, 381 A.2d 1073, 1075 (D.C.1977), *cert. denied*, 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 433 (1978). A defendant may be prejudiced by a joint trial because the jury might cumulate the evidence of the various crimes, infer a criminal disposition of the defendant, or become hostile to a defendant charged with multiple crimes. *Crisafi v. United States*, 383 A.2d 1, 3 n. 2 (D.C.), *cert. denied*, 439 U.S. 931, 99 S.Ct. 322, 58 L.Ed.2d 326 (1978). The defendant might also be confounded in presenting separate defenses to each charge. *Id.* Severance should be granted for offenses of "similar character" "unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others." *Bridges*, 381 A.2d at 1075 (citing *Tinsley v. United States*, 368 A.2d 531 (D.C.1976); *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964)). The mutual admissibility and separate and distinct grounds are not themselves mutually exclusive in a single trial. Two crimes may be mutually admissible yet still capable of prosecution in a separate and distinct manner. *See e.g. Leasure v. U.S.*, 458 A.2d 726, 729 (D.C. 1983) (crimes separate and distinct mutually admissible); *Bowyer v. United States*, 422 A.2d 973, 977 (D.C.1980) (same); *Arnold*, 358 A.2d at 338–39 (same).

Appellant contends on appeal, as he did before trial, that the two rape incidents were not similar enough to meet the test for mutual admissibility, but were too similar for the jury to keep the offenses separate and distinct. The government answers that the two rapes were tried separately and distinctly and, moreover, evidence of each rape would have been admissible at a separate trial of the other to prove common identity. As we will develop below, the trial judge did not make clear the basis of his denial of severance. Therefore, we will discuss both of the possible bases.

 We turn first to the "separate and distinct" doctrine. It permits the joint trial of charges when "the jury can easily keep such evidence separate in their deliberations and, therefore, the danger of the jury's cumulating the evidence is substantially reduced." *Drew*, 118 U.S.App.D.C. at 17, 331 F.2d at 91. Given the danger that the jury might infer guilt from a defendant's criminal disposition or might be disposed to convict because of hostility to the defendant, both court and counsel must conduct the trial with a "vigilant precision in speech and action far beyond that required in the ordinary trial." *Id.* 118 U.S. App.D.C. at 20, 331 F.2d at 94. Even if the trial court initially denies a pretrial motion to sever, it "has a continuing duty at all stages of the trial to grant a severance if prejudice appears upon the presentation of evidence at trial." *United States v. Jones*, 438 A.2d 444, 446 (D.C.1981), *cert. denied*, 456 U.S. 918, 102 S.Ct. 1992, 72 L.Ed.2d 455 (1982).

Appellant observes that unless the two assaults are found to be mutually admissible, "the points of potential similarity cut the other way. Every suggestion at trial that the two crimes [are] in some way similar increase[s] the likelihood that the jury [will become] confused or misuse [ ]

the evidence." *Tinsley*, 368 A.2d at 536–37 (citing *Drew*, 118 U.S.App.D.C. at 20, n. 21, 331 F.2d at 94 n. 21). Furthermore, the risk of prejudice to the defendant is substantial when rape charges are joined. *Bridges*, 381 A.2d at 1078.

We need not, however, address appellant's theory that the rapes of October 26 and 28 were incapable of being tried jointly on the "separate and distinct" rationale, because we conclude that in the conduct of the trial the court and prosecution in fact failed to keep the two assaults separate and distinct.

In *Drew* the court held that the jury probably confused the charges because the witnesses at times intermingled the two crimes in their testimony, the two crimes were repeatedly referred to as of the same order, and "the prosecutor in his summation not unnaturally lumped the two together on occasion in his discussion of the evidence." 118 U.S.App.D.C. at 19, 331 F.2d at 93. In *Evans v. United States*, 392 A.2d 1015 (D.C.1978), this court held that the joined offenses were not tried separate-ly and distinctly when the "prosecutor focused on the supposed similarities between the two crimes during his closing argument to the jury." *Id.* at 1022.

In contrast, the trial of joined crimes was maintained in a separate and distinct manner in *Leasure v. United States* when:

the government presented each of the two cases against appellants in a discrete manner so that there was no overlap in the testimony of the prosecution witnesses, because the trial court carefully instructed the jury to consider and decide the two cases separately from each other, and because the government was careful in its argument to the jury not to mingle evidence about each of the two cases ...

458 A.2d at 729.

The conduct of the trial here did not scrupulously prevent the overlap of the charges. The prosecutor suggested similarities between the two rapes throughout his opening statement and closing arguments.[3]

---

**3.** Some examples from the prosecutor's opening statements connecting the two rapes are:

> The evidence that you will hear ... will be ... that back at the end of last October ... two young women, here in the District of Columbia in Fort Dupont Park, were brutally raped at gunpoint.

> Well, what happens, ladies and gentlemen; [the first rape] was October 26. What happens on October 28? Well, we unfortunately start all over again.

> [The detective] ... finds a .32 caliber gun. It's dark; it's small, it's a revolver; just as the gun that was described by both [the first complainant] and [the second complainant]....

> All these things ... the very positive identification by [the first complainant]; the cord [first rape]; the tire track evidence [second rape]; the serology evidence [first rape]; the license tag [second rape]; the description of the car [first and second rapes]; and both [the second complainant] and the [first complainant's sister] went to the impoundment lot ... and both said that ... was the car that they believe they had seen.

The prosecutor also linked the two cases together during closing argument; for example:

> [The police notice a man in a dull greenish 1973 Cutlass] and they see that the man matches the description given by [the first complainant]; and indeed matches the de-scription to the extent that [the second complainant] was able to give a description of the man that had raped her.

> [The police] learn that [appellant] is twenty-seven years old just as [the first complainant] described him and, indeed, as [the second complainant] described ...

> [W]hen [appellant] raped [the first complainant] and when he raped [the second complainant] [appellant] took great pains to avoid being seen.

> [The gun found in appellant's car] as you know, was later shown to [the first complainant] and later shown to [the second complainant] and [the first complainant] said, "Yes; this looks exactly like the gun; it's got a short barrel; it's a dark-colored revolver; it looks exactly like it." [The second complainant] told you the same thing; "Short, dark revolver; it looks just like the gun that was used on them."

> [W]e ask you to consider this evidence; this evidence that speaks out so loudly to you; this gun that says guilty [first and second rapes]; this license tag that says guilty [second rape]; this rope that says guilty [first rape]; the plaster cast that says guilty [second rape]; and the comparison of the tires that says guilty [second rape], and we urge you to re-turn separate verdicts of guilty in the [first

Although the prosecutor to a large extent presented the evidence in the two cases in a discrete manner, some overlap occurred when the arresting detective and the forensic experts testified. The court did, however, instruct the jury to decide the two cases separately from each other.[4] Nevertheless, we cannot sustain the joinder of the rape charges on the "separate and distinct" ground because the prosecutor focused on the similarities between the two rapes and merged his references to the two offenses in opening statement and closing argument.[5] In addition, because the trial court had not clarified the bases for its denial of severance or its ruling on reciprocal admission, the defense addressed the question whether the same man committed both rapes in its opening statement, and carefully questioned about the differences in the manner in which the two offenses were committed. This made the proceedings even less separate and distinct.

We turn now to an analysis of whether the joinder of the two rape cases was proper under the "reciprocal" or "mutual admissibility" doctrine. That doctrine recognizes that the joinder for trial of two crimes does not unduly increase the likelihood that the jury will infer a criminal disposition when the rules of evidence would have permitted the admission of evidence of each crime at the separate trial of the other. *Drew,* 118 U.S.App.D.C. at 16,

331 F.2d at 90. The court explained in *Drew:*

It is a principle of long standing in our law that evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged. Since the likelihood that juries will make such an improper inference is high, courts presume prejudice and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose....

Evidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial. When the evidence is relevant and important to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value.

118 U.S.App.D.C. at 15–16, 331 F.2d at 89–90 (footnotes omitted). *See also Tinsley,* 368 A.2d at 534 (when evidence relevant and important as other crimes evidence, probative value deemed greater than prejudice).

---

complainant's] and the [second complainant's] case and in the gun case on November 10th.

4. The court read standard jury instruction 2.50, which states:

A separate offense is charged in each of the counts of the indictment which you are to consider. Each offense, and the evidence which applies to it, should be considered separately, and you should return separate verdicts as to each count ... The fact that you may find the defendant guilty or not guilty on any one count of the indictment should not control or influence your verdict with respect to any other count or counts of the indictment.

Criminal Jury Instructions for the District of Columbia, No. 2.50 (3d ed. 1978). The jury sent a note to the judge during deliberations asking

for "confirmation that we may or may not compare evidence from one assault to the other; or are we to consider this as one case with all the evidence applicable?". The court replied by re-reading instruction 2.50 to the jury.

5. We are not rejecting the separate and distinct basis for joinder as a sanction for prosecutorial misconduct. *See Drew,* 118 U.S.App.D.C. at 19–20, 331 F.2d at 93–94 (prosecutor's failure to conduct trial apparently not purposeful; nevertheless, impact on jury not lessened by lack of improper motive). Rather, the burden of conducting the trial in a separate and distinct manner is upon both court and counsel. Furthermore, as discussed *infra,* the trial court's failure to clarify his reason for denying severance may have given the prosecutor a good faith basis, at least until closing argument, for believing that he was permitted to link the two cases together.

■ Evidence tending to prove identity or common plan meets the mutual admissibility test when "there is a reasonable probability that the same person committed both crimes due to the concurrence of unusual and distinctive facts relating to the manner in which the crimes were committed." *Drew*, 118 U.S.App.D.C. at 16, 331 F.2d at 90. The crimes need not be identical in every detail. *Brooks*, 448 A.2d at 257; *Bradley v. United States*, 140 U.S. App.D.C. 7, 14, 433 F.2d 1113, 1120 (1969). Nor must the offenses share any single factual characteristic that is compellingly unique. *Bridges*, 381 A.2d at 1078; *Gates v. United States*, 481 A.2d 120, 123 (D.C. 1984), *cert. denied*, ⎯ U.S. ⎯, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). Rather, the total combination of the circumstances of each crime must be compared. *Gates*, 481 A.2d at 123; *Bradley*, 140 U.S.App.D.C. at 14, 433 F.2d at 1120.

■ The government listed 21 points of similarity between the two crimes. The defense countered with several differences in the circumstances.[6] We are satisfied that the totality of the circumstances demonstrates a reasonable probability that the same man attacked both complainants. Of particular significance is the occurrence of the crimes in the same general wooded area only two days apart; the identical approaches to the side of the victims with the same type of gun; the initial robbery of each victim; similar instructions given by the assailant, and the parallel descriptions of the assailant and the car.

Furthermore, the evidence of each crime offered a real contribution to the crucial issue of identity. *See Bradley*, 140 U.S. App.D.C. at 13, 433 F.2d at 1119; *Gates*, 481 A.2d at 124. The strong testimonial identification of appellant by the first complainant buttressed the case against appellant in the second rape, in which the second complainant made no positive identification.

The second complainant's identification of appellant's car enhanced the identification made by the first complainant's sister. Therefore, denial of appellant's severance motion was permissible under the mutual admissibility doctrine.

Ordinarily our review of the severance issue would be completed upon our determination that the crimes were mutually admissible. Appellant, however, contends that he was prejudiced in presenting his defense because the trial judge did not specify upon which of the two theories he was denying severance. If appellant had known that evidence of the two crimes was deemed mutually admissible, he argues, the defense might have chosen to develop further the differences between the two assaults in cross-examination and closing argument.

A review of the record discloses confusion as to the trial judge's rationale for denying the motion to sever. Appellant had argued in his pretrial motion that the two rapes were not mutually admissible, nor were they separate and distinct. The government, in its opposition to the motion to sever, stressed that the assaults were mutually admissible. The government added that the offenses could also be tried separately and distinctly. After a pretrial hearing, the judge denied the motion to sever, stating:

> This argument is very interesting in that when you look at the *Bridges* case, . . . 381 A.2d 1073; when you look at the *Drew* case [118 U.S.App.D.C. 11, 331 F.2d 85]; when you look at the *Evans* case, . . . 392 A.2d [1015]; and the *Tinsley* case, 368 A.2d 531 19[76]), and then some others. *Bell v. United States* [332 A.2d 351 (D.C.1975)]; it is true the Court of Appeals has attempted to differentiate in granting the motion for severance with burglary and rape.

---

**6.** The defense in its motion to sever counts observed seven differences between the assaults, primarily that the first complainant was immediately forced into the woods, while the second complainant was first abducted in a car, and raped in the car, and that the first complainant was raped and sodomized twice, while the second complainant was raped once and was not sodomized.

However, the Court of Appeals has said that in a rape case, the trial judge must look more closely.

[T]he Court has to agree that the cases will not be severed *for the reason it meets the test in all the cases submitted.* The motion will be denied on the grounds that the cases are properly joined. (Emphasis added)

While this statement could be taken to mean that joint trial was approved on both grounds, appellant contends that it did not clarify whether the two rapes were mutually admissible, or were to be kept separate and distinct.[7] According to appellant, the prosecutor seemed to assume during trial that the crimes were mutually admissible. Appellant objected often to the government's attempts to link the crimes.

The government replies that even though the judge's rationale was unclear at the time of his initial ruling, it became clear during trial, and was definitively clarified prior to closing argument, that the denial of severance was upon the separate and distinct rationale. The record, however, supports instead appellant's observation that the government conducted the trial on the assumption that the judge had ruled the two rapes to be mutually admissible. The prosecutor linked the two assaults together many times during his opening statement and closing argument. *See, supra.* When defense counsel objected to the opening statement, the prosecutor answered that the "many similarities between the two crimes is exactly the sort of evidence that we are attempting to show, and that the Court relies on this, keeping these cases together. In other words, the similarities are very relevant to identification; therefore, I disagree very strongly ... I think that it is perfectly permissible." The court did not expressly overrule or sustain the defense objection, stating that "[a]t the appropriate time, the Court will advise the jurors as to statements of counsel."

The government, also consistent with an apparent belief that the judge had ruled the crimes to be mutually admissible, asked at the close of evidence for an instruction that evidence relating to each separate sexual assault could be considered in connection with the other assault only as proof of identify.[8] The defense objected, arguing that "this Court has never made a ruling that these two offenses were so similar as to basically fit within the identity exception under which *Drew* evidence is permitted." The prosecutor replied that the standard for *Drew* evidence is the same as that for the motion to sever, and that he understood that "the Court, by its ruling [on the motion to sever], concluded that the evidence of each crime was mutually admissible under *Drew*." The court did not agree or disagree with defense counsel's statement that he had not found mutual admissibility, but declined to give the *"Drew"*-type instruction and stated that this "Court has consistently advised counsel to keep the cases separate by argument and by evidence. [The prosecutor] may argue noth-

---

7. *Bridges* affirmed a denial of severance on the ground that the crimes at issue were mutually admissible. 381 A.2d 1073. *Drew,* 118 U.S.App. D.C. 11, 331 F.2d 85, and *Evans,* 392 A.2d 1015, both held the joined offenses were neither mutually admissible nor separate and distinct. In *Bell,* the charges were not mutually admissible, but the court affirmed the denial of severance because they were separate and distinct. 332 A.2d 351.

8. The government proposed the following instruction:
 Evidence has been introduced with respect to the defendant for two separate sexual assaults; one occurring on October 26 and one occurring on October 28th. The evidence as to each assault was admitted for your consideration as to the other assault only for your consideration of whether it shows or [ ] tends to show that the defendant is the person who committed the offense for which he is now on trial.
 This is a modification of instruction 2.49, the instruction used for *Drew* other crimes evidence. *See* Criminal Jury Instructions for the District of Columbia, No. 2.49 (3d ed. 1978). The government suggested that *Drew*-type instruction in conjunction with an instruction for separate consideration of the offenses. The court gave only the latter type of instruction. *See* Criminal Jury Instruction No. 2.50.

ing that would join these two cases together." Thus, the record belies the government's present contention that the separate and distinct rationale was known to both counsel during trial as the basis for denial of the motion for severance. More important, the judge did not clarify in the above statement, or at any other time, whether he had rejected or accepted the mutual admissibility rationale.

■ Under the circumstances, we must conclude that the trial court erred in the manner in which it conducted the trial following its denial of severance. If the sole basis for denial had been that the two offenses lent themselves to being tried separately and distinctly, then there was, as we have seen, a failure to conduct the proceedings accordingly. If it was mutual admissibility, then the trial court erred in failing to communicate that ruling to the parties so that they could try the case accordingly.

Appellant insists that the error was not harmless in that the trial judge's failure "to give a clear ruling as to the grounds for its denial of severance" caused the de-

fense to fail to bring out the differences between the two occurrences.

Whether such error requires reversal depends not only upon the extent to which the record bears out appellant's arguments about the effect of the error on the conduct of the defense case, but also on the strength of the evidence of appellant's guilt of the two offenses, respectively. *Cf. Walker v. United States*, 135 U.S.App.D.C. 280, 282, 418 F.2d 1116, 1118 (1969) (court weighs relative strength of evidence to determine whether trial error under FED.R. CRIM.P. 30 is prejudicial).

Turning first to the impact on the conduct of the defense, it is clear that the defense did not pass up its opportunity to use its opening statement to attack the government's theory that the same man committed both rapes. The excerpt from the defense opening statement set forth in the footnote establishes that point.[9] The same is true of the manner in which defense counsel cross-examined the government's witnesses. Most significant, when defense counsel cross-examined the second

9. First of all, ladies and gentlemen, the same person did not commit both of these crimes; that's the first thing that you've got to look at. These crimes have some similarity but they also have many differences, and it is important for you to look at that.

Among the differences, just to mention a few, one crime took place in broad daylight; the other crime took place in the evening. In one crime, a man walked up to a woman. He didn't abduct her in a car; he didn't rape her in a car; he came up to her on foot; he left her on foot.

In the other crime, the man kidnapped the woman in a car and he raped her inside of a car.

In one case, a man forced a woman to participate in oral sodomy; in the other case, the woman was not sodomized.

There are many, many differences in these cases. Yes, both cases took place in Fort Dupont Park but, ladies and gentlemen, did you know that they took place about a mile apart in two separate areas of Fort Dupont Park.

[The prosecutor] says to you in both cases there was a greenish-brown car seen.

Well, that's not correct, ladies and gentlemen. In the first case, a witness, [first com-

plainant's sister], tells the police that she noticed a car. She describes that car as a brown car; she doesn't say that it has a black vinyl top. She doesn't say that it's a greenish car; she describes it as a 442, a particular type of Oldsmobile.

In the second case, ladies and gentlemen, [second complainant] says that she is abducted by a man in a two-tone car; a car which has a black vinyl top and brown bottom.

The car that Mr. Cox is found driving, ladies and gentlemen, is a green car, not a brown car. It's a two-tone car; not one tone, the way that [first complainant's sister] described it. It had certain things in it that are described by [second complainant] and certain things that are not described by her.

So, when [the prosecutor] comes before you and talks about how the two cases both involve the use of a car, I just ask you to listen carefully to the evidence and to hear, is it in fact, the same car being described by these people or is it a different car being described.

Now once you look at these cases and realize that you have to decide them separately, what is involved here in these two individual cases?

complainant he carefully elicited from her the aspects of the sexual assault upon her that differed from the assault 2 days earlier on the first victim.[10]

It is true that in closing argument appellant did not attempt to identify distinguishing features of the two offenses as much as he might have if the court had ruled that severance was being denied because of mutual admissibility. Before closing argument, however, the defense had opposed the government's request that the court give a variation of Standard Jury Instruction No. 2.49 that would have told the jury of the limited extent to which it could consider the evidence of one assault in connection with its determination of appellant's involvement in the other.[11] After the defense prevailed in its opposition, the government in its closing did not argue that the evidence of appellant's commission of either offense was probative of the identity of the assailant in the other. The defense followed suit by not referring directly to the possibility that evidence of the commission of one offense was probative of guilt of the other. This omission by the defense is the only important respect in which the record bears out the appellant's contention that the confusion over the trial judge's reason for denying severance caused the defense to refrain from developing the differences between the first and second assaults. While it is conceivable that the defense would have done more in this regard in opening statement and cross-examination if the trial judge had expressly based his severance ruling on mutual admissibility, the record is clear enough to leave us confident that the defense effectively developed the distinctions between the two assaults during the entire trial except in closing argument. The failure to

develop the point there resulted in large part, however, from appellant's tactical decision to oppose the limiting instruction which the government sought. We weigh that fact along with all of the circumstances in determining the extent to which the trial judge's error harmed appellant.

The most important remaining circumstance to be weighed is the strength of the evidence of appellant's guilt regarding the two offenses. As appellant concedes, the proof of his guilt of the assault upon the first complainant was strong. That complainant positively identified appellant in a photographic array, at a lineup, and at trial, based upon her direct and focused observation of appellant in daylight for a considerable period of time. In addition, appellant's car generally fit the description of the suspicious car sighted by the first complainant's sister, and appellant possessed the jacket, rope, and gun identified by the first complainant. We hold that erroneous failure to clarify the basis for denial of severance was harmless in connection with the charges relating to the October 26th rape. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

Turning to the strength of the evidence of the appellant's guilt of the second rape, we hold that although the victim could not identify appellant, the government's case was indeed strong. Strikingly incriminating was the 15-year-old victim's testimony that she saw a white license plate lying face down on the floor behind the front passenger seat of the vehicle in which she was raped. A license plate of the same description was found in that position in appellant's car when he was apprehended. Like the license plate seen by the victim, it bore the number 3. The young woman's

---

10. Defense counsel developed the following points of difference: the way the assailant moved in first approaching the victim, the fact that the rape took place in a car as distinguished from on the ground, that the assailant did not use the same words in ordering the second complainant to strip her clothes as had the first complainant's assailant, that he did not pretend to give her a choice between sodomy and rape,

that he did not give the same instructions as to how to act during intercourse, that he committed only rape and not oral sodomy as well, and that the second complainant could not identify her attacker.

11. *See* footnote 8, *supra.*

description of the car's exterior and interior matched appellant's car; a forensic expert testified that a plaster cast of a tire impression at the sight of the assault corresponded to the tread design on the four tires of appellant's car; the victim's general description of the assailant matched appellant well; appellant possessed a jacket and gun similar to the one she described, and appellant was sighted by the police 2 weeks after the offense a very short distance from where the second complainant was kidnapped. In our view this evidence is enough to render the error harmless.

There is, however, more. As we developed above, the evidence of the first offense was strongly probative of appellant's identification as the second rapist. Given the numerous points of similarity between the two offenses and the other considerations we discussed above, it is highly probable that if he had ruled specifically on the point, the trial judge would have ruled the evidence of the first offense admissible as more probative of identity than prejudicial. *Bell,* 332 A.2d at 353–54. True, we must discount the impact of that evidence because of the fact that the defense would marshall all available evidence and arguments to show that a different person perpetrated each of the two offenses. Countervailing that consideration is the fact that the government, if permitted to do so, could argue persuasively for the opposite conclusion. Considering, then, the circumstances in their entirety, we are satisfied that the trial court's error was harmless.[12]

*Affirmed.*

---

**12.** Appellant also contends that the prosecutor's rebuttal argument denied him his right to a fair trial. Upon review of the transcript, we find that the prosecutor's comment that defense counsel had charged some of the government witnesses with fabricating their testimony, while of questionable propriety, had some record basis in defense counsel's closing argument. Defense counsel had suggested that those witnesses had "stretched" memories and facts concerning the description of the unidentified assailant to conform to appellant's appearance. *See Sherrod v. United States,* 478 A.2d 644, 657–58 (D.C.1984). The use of defense counsel's name to identify defense arguments is not in itself improper, and did not amount here to a personal attack on defense counsel. *Cf. Sherer v. United States,* 470 A.2d 732, 741–43 (D.C.1983)

(*ad hominem* attacks against opposing counsel improper), *cert. denied,* —— U.S. ——, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984). To the extent that the prosecutor suggested that defense counsel's cross-examination of government witnesses had been unfair, such possible error does not warrant reversal here. *See Jaggers v. United States,* 482 A.2d 786, 796 (D.C.1984). The prosecutor's remarks were made during rebuttal and the court thereafter instructed the jury that comments of counsel were not in evidence. *Dyson v. United States,* 450 A.2d 432, 439 (D.C.1982). As discussed, *supra,* the evidence against appellant regarding the assaults was strong. We conclude that any arguable prosecutorial misconduct was harmless. *See Jaggers,* 482 A.2d at 796.